**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Kim M. Lundberg,

Plaintiff,

v.

Burlington Northern and
Santa Fe Railway Company,
a corporation,

Defendant.

Civil No. 01-2286 (DWF/JSM)

**MEMORANDUM OPINION AND ORDER**

---

Kim M. Lundberg, 9678 - 181st Avenue Northwest, Elk River, Minnesota 55330, Plaintiff.[1]

Rodney A. Honkanen, Esq., and Scott H. Rauser, Esq., Spence, Ricke, Sweeney & Gernes, 600 Degree of Honor Building, 325 Cedar Street, Saint Paul, Minnesota, 55101, counsel for Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on May 9, 2003, pursuant to Defendant Burlington Northern and Santa Fe Railway Company's Motion for Summary Judgment. For the reasons set forth below, Defendant's motion is granted.

---

[1] Plaintiff was represented by Cortney S. LeNeave, Esq., Hunegs, Stone, Koenig & LeNeave, 1650 International Center, 900 Second Avenue South, Minneapolis, Minnesota 55402, and Richard L. Carlson (not admitted) until after the oral argument on this matter. By letter dated May 28, 2003, Plaintiff notified the Court that she was no longer represented by these attorneys. Plaintiff has not notified the Court of her new counsel in the matter.

JUN 1 7 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD JUN 1 7 2003
DEPUTY CLERK

## Background

Plaintiff Kim M. Lundberg has been employed by the Burlington Northern and Santa Fe Railway Company ("BNSF") for approximately 22 years. This case arises out of several work-related injuries that Lundberg suffered and Lundberg's allegations of disability discrimination by BNSF.

Lundberg was initially hired by BNSF in the late 1970s as a "trainman/yardman." According to Lundberg, a trainman works as a conductor on the road. A yardman performs a variety of jobs in the railroad yard, including switchman, hump foreman, switch tender, utility work, flagman, pilot, and hostler.

While she was working as a trainman/yardman for BNSF at BNSF's Northtown yard in Minneapolis, Lundberg suffered three work-related injuries between November 1992 and May 1994. Lundberg's first work-related injury occurred in November 1992, when she suffered a hernia while hand-braking a railroad car. After this injury, Lundberg worked as a switchman at BNSF until 1994, when she had surgery to correct the injury. Shortly after Lundberg returned to work in April 1994, Lundberg reinjured herself while riding on the end of a rail car. Lundberg again returned to work as a switchman in May 1994. She was reinjured a day or so after returning to work when she was knocked off a rail car.

After this third injury, Lundberg no longer worked as a switchman because it was determined that she could not meet the physical requirements of riding on rail cars or throwing track switches. Thus, Lundberg trained to work as a hump foreman, a desk position in which she operated a computer and watched cameras that showed the movement of cars in the rail yard. Lundberg also trained to work as a switch tender. Switch tenders act as desk dispatchers, routing

traffic in and out of the rail yard. During all of 1995 and up until July 1996, Lundberg worked regularly as a hump foreman or switch tender under the supervision of Jim Perdew, BNSF terminal manager at Northtown. Lundberg received her work assignments via the "daily mark," a system established by the collective bargaining agreement whereby a pool of employees are given a choice of jobs to select from each day, in order of the employees' seniority. Because the jobs on the daily mark are doled out according to seniority, a person of low seniority could potentially be without a job if the jobs are all taken by employees with higher seniority.

In July 1995, Lundberg commenced an action pursuant to the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60 ("FELA"), against BNSF, alleging that the aforementioned injuries were a result of BNSF's negligence. As a result, in February 1996, BNSF requested that Lundberg undergo an independent medical examination. Lundberg was examined by Dr. James Finnell, who determined that Lundberg had a small, recurrent umbilical hernia and that she should continue to work only the hump foreman and switch tender jobs.

In March 1996, Perdew was deposed as part of Lundberg's FELA case. In his deposition, Perdew stated that after Lundberg was injured, he had been able to find office work for her during the times that her seniority did not allow her to work as a hump foreman or a switch tender on the daily mark. However, Perdew stated he could not commit to continuing to accommodate her in this manner. Further, Perdew stated that Lundberg could be bumped from her positions of switch tender and hump foreman by a person of more seniority.

Ultimately, Lundberg and BNSF settled the FELA case in September 1996 after negotiations between Troy Traylor, a BNSF Claims Representative, and Greg Yaeger, Lundberg's FELA attorney. As part of this settlement, Lundberg executed a release. The

one-page settlement release, signed on September 23, 1996, states that Lundberg was releasing BNSF from "all claims and liabilities of every kind or nature" arising out of the accidents that had occurred. The settlement release further states: **"NO PROMISE OF ANY KIND HAS BEEN MADE TO ME IN CONNECTION WITH THIS SETTLEMENT."** (Emphasis in original.) The settlement release did not contain any provision requiring BNSF to pay Lundberg if she was unable to hold a switch tender or hump foreman position. However, Lundberg asserts that she thought that she would be able to continue working as a hump foreman or switch tender, and that she would either be provided with office jobs or be paid without working on the days that she could not get a job as a switch tender or hump foreman from the daily mark.

Perdew left his position as terminal manager in July 1996. Until approximately the end of 1999, Lundberg continued to work as a shift tender or a hump foreman, and she was able to find office work or be paid for the time when she could not get work from the daily mark. However, in about 1999, David Hanson, the terminal superintendent, changed the practice of allowing Lundberg to do this. Hanson also reduced the number of switch tender and hump foreman jobs.

In March 2000, Lundberg began working on the "reserve board." The reserve board, established by the collective bargaining agreement, occurs when furloughs of union employees reach a certain defined level. The reserve board is comprised of certain employees who can no longer hold a craft position due to their seniority. These employees are paid 75% of their wages and benefits to not work, but they must make themselves available to return to active service in their craft upon 15 days' notice. Because the employees are placed on the reserve board according to seniority, a higher seniority employee can "bump" a more junior employee off the

reserve board. Lundberg bumped onto the reserve board in March 2000, where she remained until May 2000. At that time, her seniority would no longer allow her to remain on the board, and she returned to the position of switch tender or hump foreman. Lundberg did not attempt to go on the reserve board after this time.

In approximately May 2000, Lundberg had a surgical procedure to repair a ruptured bowel, the occurrence of which was unrelated to work. When she returned to work in June 2000, her treating doctor placed her on a 30-pound lifting restriction, as reflected in BNSF's Anticipated Return to Work Plan. The Return to Work Plan stated, "Employee should be able to work as hump foreman and switch tender within [the 30-pound] restriction." With this restriction, Lundberg worked regularly as a hump foreman and switch tender until November 2000.

Apparently around this same time, Lundberg sought to go on the switchpersons' extra board. The switchperson craft is comprised of five positions: switchperson, switch foreman, hostler, switch tender, and hump foreman. The core positions of this craft are the entry level positions of switchperson and switch foreman, such positions which undisputedly comprise approximately 80% of the craft positions filled by the extra board. The switchpersons' extra board is a pool of switchperson craft employees who, on a rotating basis, fill positions that open up on the board because of other employees' vacation or illness. Employees on the switchpersons' extra board are guaranteed pay for five days per week, regardless of whether they are called to work or not. The pay for the switchpersons' extra board is the same as if the person was working on the daily mark.

At some point in 2000, Hanson met with Labor Relations and discussed the switchpersons' extra board. At that time, it was decided that because the primary purpose of the extra board was to cover vacancies in the core jobs of switchperson and switch foreman, as these comprised approximately 80% of the positions filled by the extra board, an employee who could not perform these core jobs would not be allowed on the board. As a result, Lundberg and some other employees were not allowed on the switchpersons' extra board.

In April 2001, Lundberg filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that she was being discriminated upon by not being afforded the same reserve board and extra board opportunities as non-disabled male employees. By its letter of August 24, 2001, the EEOC determined that BNSF's policies related to the extra board and reserve board violated Title I of the ADA.

Lundberg was allowed to work on the extra board from approximately August 2001 through August or September 2002. During that time, she received her guaranteed wages even when there were no hump foreman or switch tender positions available. However, at some point in November 2001, Thomas Rowley, a new terminal superintendent at Northtown, notified Lundberg that her pay would be cut so that she would no longer receive guaranteed pay for days when she could not perform a job because of her physical restrictions. The pay cut became effective in February or March 2002, but apparently applied retroactively to November 2001.

Lundberg initially commenced this action in Hennepin County District Court on November 21, 2001, and the action was removed to this Court on December 11, 2001. Lundberg's complaint alleges disability discrimination under the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA"), gender discrimination under Title

VII of the Civil Rights Act ("Title VII") and the MHRA, and seeks rescission of a release that she signed in September 1996 as a result of the settlement of her FELA case with BNSF. In Lundberg's briefing in response to BNSF's motion for summary judgment, Lundberg withdrew her gender discrimination claims (Counts 3 & 4), as well as the allegations that BNSF defrauded her or engaged in misrepresentation in obtaining the release (Counts 5 & 6). Thus, the only claims that remain to be addressed are Lundberg's claim of disability discrimination and the question of mutual mistake as to the September 1996 settlement agreement.

Since August 2002, Lundberg has held steady employment as a switch tender or hump foreman on the daily mark.

**Discussion**

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1; *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The

nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**2. ADA and MHRA**

To establish a prima facie case of disability discrimination under the ADA, Plaintiff must prove that: (1) she is disabled within the meaning of the Act; (2) she is capable of performing the essential functions of her job, with or without reasonable accommodation; and (3) she suffered an adverse employment decision because of her disability. *See Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 (8th Cir. 2003). The ADA analysis applies equally to an MHRA claim. *Roberts By and Through Rodenberg-Roberts v. KinderCare Learning Centers, Inc.*, 86 F.3d 844, 846 n.2 (8th Cir. 1996).

BNSF asserts that Lundberg has failed to establish a prima facie case of disability discrimination under the ADA and the MHRA. First, BNSF contends that Lundberg does not have a disability under the ADA and MHRA. In addition, BNSF asserts that Lundberg has not demonstrated that she is substantially limited in her major life activities. The Court agrees.

The ADA defines a disability as: "(A) a physical or mental impairment that substantially[2] limits one or more major life activities of the individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. 12102(2). "'Substantially' in the

---

[2] While the MHRA standard is for an impairment that "materially" limits one or more major life activities, the Eighth Circuit has determined that this is merely a semantic difference. *Weber v. Strippit, Inc.*, 186 F.3d 907, 912 n.4 (8th Cir. 1999).

phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'" *Toyota Motor Mfg., Kentucky v. Williams*, 534 U.S. 184, 196 (2002). "Major life activities" are those that are "of central importance to daily life." *Id.* at 197.

Lundberg asserts that her hernia condition and her 30-pound lifting restriction constitute disabilities that prevent her from holding a job in her craft other than switch tender and hump foreman. Further, Lundberg asserts that these conditions limit her performance in everyday household tasks.[3] The Court finds that these conditions are not sufficient to render Lundberg disabled under the ADA.

First, lifting restrictions alone do not constitute a disability under the ADA. *See, e.g., Conant v. City of Hibbing*, 271 F.3d 782, 785 (8th Cir. 2001) (citations omitted). In addition, the Court finds that Lundberg's hernia condition is not sufficient to render her disabled under the ADA. In so holding, the Court finds persuasive other courts' determinations that because a

---

[3] As to the limits placed on her household tasks, Lundberg specifically asserts:

> As a result of [Lundberg's] disability, she is restricted in doing daily household chores such as vacuuming, washing floors, carrying items up and down the stairs in her split level house. Although she is not completely unable to clean her house, it takes substantially longer. When she does perform her household chores, she experiences increased pain. Prior to her disability, [Lundberg] had both a vegetable garden and flower garden. She now only has a small flower garden. Prior to her disability, she enjoyed playing soccer with her daughter during the summer months. She now cannot participate in such activity. [Lundberg] has problems carrying groceries into her house. She packs the groceries in small, lighter bags. [Lundberg] cannot pull a full garbage dumpster to the end of her land (she lives on 10 acres). She cannot carry bags of water softener salt into her house. Lastly, although [Lundberg] is divorced and not involved in a personal relationship, she is concerned above [sic] having an intimate relationship due to her disability.

*See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 11.

hernia is temporary, can be corrected by surgery, and does not substantially limit major life activities, a hernia does not constitute a disability under the ADA. *See, e.g., Johnson v. City and County of San Francisco*, 2001 WL 263298 at *5 (N.D. Cal.); *Gonzalez v. Perfect Carton Corp.*, 1996 U.S. Dist. LEXIS 2257 (N.D. Ill.).

Here, Lundberg concedes that her hernia "doesn't bother [her] that much" and that she has "been able to manage it." *See* Lundberg Dep. at 41-42. Lundberg does not dispute that her hernia could be repaired by surgery; however, she has chosen not to have it repaired. *Id.* at 42. Moreover, Lundberg has failed to establish that either the lifting restriction or her hernia condition limit her major life activities. First, Lundberg has not established that she is substantially limited in the major life activity of working. Lundberg has not established that she is unable to perform a broad class of jobs (*see Sutton v. United Airlines, Inc.*, 527 U.S. 471, 491 (1999)), but rather has merely established that she cannot perform a very narrow category of jobs that require lifting greater than 30 pounds. However, Lundberg has worked consistently in other positions, such as switch tender and hump foreman. Thus, Lundberg's assertions are not sufficient to establish that she is substantially restricted in her major life activity of working. *See id.* In addition, Lundberg has not established that she is substantially limited from performing other major life activities. The Eighth Circuit has held that gardening, mowing the lawn, and participating in sports activities are not "major life activities" under the ADA. *See Weber v. Strippit, Inc.*, 186 F.3d 907, 914 (8th Cir. 1999). As to any of Lundberg's remaining claims of limitation, while Lundberg asserts that her daily household chores and personal activities are limited, Lundberg has admitted that she still can perform many of these activities, but just in a somewhat restricted manner. Lundberg admits that she can vacuum, but with a vacuum that

weighs less than 30 pounds. Lundberg still can clean her floors, work in her flower garden, mow her lawn, and carry groceries. Finally, the assertions regarding Lundberg's sexual relations are merely hypothetical–she has not been diagnosed with any type of problems related to her sexual relations, nor has she asserted that she has actually experienced any discomfort in her sexual relations. Thus, none of these issues result in Lundberg being substantially limited in her major life activities as required by the ADA.

Based upon these considerations, Lundberg's lifting restriction and her hernia condition do not constitute a disability, and her claims under the ADA and MHRA are properly dismissed.

**3. The Settlement Agreement**

Lundberg seeks rescission of the 1996 FELA settlement release on the basis of an alleged mutual mistake of fact. Specifically, Lundberg asserts that she believed that her seniority would allow her to continue working as a hump foreman or switch tender in the future.

The validity of a FELA release is a federal question to be determined by federal law. *Dice v. Akron, C. & Y. R. Co.*, 342 U.S. 359, 361 (1952). The party attacking a FELA settlement bears the burden of proving invalidity. *Callen v. Pennsylvania R. Co.*, 332 U.S. 625, 630 (1948). One of the grounds for setting aside a settlement is mutual mistake of fact. *Id.* at 629.

Here, Lundberg has failed to meet her burden of proving invalidity of the release by reason of mutual mistake. Plainly, the release contains no language to support Lundberg's assertions. Lundberg apparently rests her claim of mutual mistake on the deposition testimony of her manager Perdew, made six months prior to the settlement. However, Perdew was not a party to the release. Moreover, at the time of his deposition, Perdew merely stated that it was possible, but not probable, that Lundberg could get bumped from her position as hump foreman or switch

tender. Perdew made no promises as to Lundberg's future employment; in fact, he specifically stated that he could not commit to continuing to provide Lundberg with office work when she was unable to hold either the switch tender of hump foreman position. In addition, Lundberg admits that neither the railroad representatives who negotiated the release nor her attorney made any sort of agreement at the time of the settlement as to BNSF's ability to accommodate her position of hump foreman or switch tender. *See* Lundberg Dep. at 158-59, 201-02. Based upon these factors, no genuine issue of material fact exists as to Lundberg's claims of mutual mistake. BNSF's motion for summary judgment is granted on this issue.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Defendant Burlington Northern Santa Fe Railway Company's Motion for Summary Judgment (Doc. No. 11) is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: June 17, 2003

DONOVAN W. FRANK
Judge of United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.